# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 14, 2013 Session

## STATE OF TENNESSEE v. JENNIFER HANNAH

### Appeal from the Criminal Court for Davidson County
No. 2008-D-4138    Steve Dozier, Judge

---

### No.  M2012-00842-CCA-R3-CD - Filed January 14, 2014

---

Appellant, Jennifer Hannah, was indicted by the Davidson County Grand Jury for four counts of child neglect, one count of first degree felony murder during the perpetration or attempt to perpetrate aggravated child neglect, and two counts of delivering a controlled substance to a minor.  At the conclusion of a jury trial, she was found guilty of all counts as charged. The trial court sentenced her to an effective sentence of life imprisonment.  On appeal, Appellant argues: (1) the trial court erred in allowing the testimony of Michael Orman under the provisions of Rule 404(b) of the Tennessee Rules of Evidence; (2) the trial court erred in denying Appellant's motion for continuance; (3) the trial court erred in denying her motion to suppress statements made to law enforcement officers; (4) the trial court erred in denying her request for an instruction regarding lost or destroyed evidence; (5) the trial court erred in instructing the jury on the elements of aggravated child neglect; and (6) the trial court erred in allowing the admission of an audio recording of a deceased witness.  After a thorough review of the record, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed..**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

Patrick T. McNally, Nashville, Tennessee, for the appellant, Jennifer Hannah.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. Johnson, District Attorney General, and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Factual Background*

On June 27, 2008, Davidson County emergency personnel were sent to Appellant's home in Nashville. Prior to the dispatch, the emergency communications center received two 911 calls, one from Appellant and one from Appellant's husband. The calls indicated that the victim, A.H.[1], was barely breathing. The 911 operator told Appellant how to perform CPR until the paramedics arrived.

When Scott Hessey, a firefighter and EMT with the Nashville Fire Department, arrived at the residence at 4:34 p.m., he was directed to the second floor. He was accompanied by Daryl Kirby. Mr. Hessey discovered a sixteen-month-old child not breathing and lying on the floor. When Mr. Hessey checked the victim, he realized that she did not have a pulse, was not breathing, and was a blue color. Mr. Hessey noticed that there was vomit inside the victim's mouth and on the floor near where the victim was lying. The EMT attempted to give the victim oxygen, but the victim's status did not change. When Mr. Hessey asked Appellant if the victim had been sick recently, she responded that she had not.

James Scott Reinard arrived at the residence in an ambulance. Mr. Hessey carried the victim out to the ambulance. Mr. Reinard noticed that A.H. was "lifeless and limp." He stated that when he connected her to the cardiac monitor, her heart had no electrical activity. Therefore, he decided to stop CPR at 4:45 p.m.

Officer Kevin Cooley was a detective in the Youth Services Division with the Metropolitan Police Department at the time of the victim's death. Officer Cooley testified that whenever there is a child's death in Davidson County, the Youth Services Division responds to the situation and investigates as a matter of protocol. Officer Cooley was assigned to investigate A.H.'s death. He stated that it was his first death investigation.

He arrived at Appellant's residence at 5:45 p.m. and was informed that the victim had been taken to Southern Hills Hospital. At that point, Officer Cooley had no indication as to what had caused the victim's death. He began his investigation by interviewing the people who had been with the victim that day, namely Appellant and her husband, Michael Hannah.

Officer Cooley interviewed Mr. Hannah in Officer Cooley's car. Officer Cooley testified that Mr. Hannah was distraught and was crying during the interview. He told Officer Cooley that he gave CPR to A.H. Mr. Hannah did not indicate that there had been any trauma involved with A.H.'s death. Officer Cooley stated that he recorded the interview.

---

[1] It is the policy of this Court to refer to minor victims by their initials.

Officer Cooley also interviewed Appellant separately from Mr. Hannah. Officer Cooley stated that he spoke with her in the foyer of the home. He asked Appellant to show him where she found the victim. Appellant took him to the bonus room. The bonus room was the setting for the remainder of the interview. Officer Cooley stated that he also recorded his interview with Appellant. He began recording when he entered the house until the interview ended. The recording lasted about one hour and twenty minutes. The recording included a re-enactment that occurred at the end of Appellant's interview. Officer Cooley testified that Appellant was never advised of her *Miranda* rights because at the time of the interview, the officers were not aware that they were dealing with a crime. Appellant was also never restrained or arrested.

Officer Cooley stated that there were two other detectives present, Selene Julia and Don Long, who first responded to the hospital and subsequently came to Appellant's house. Detective Julia was primarily responsible for taking photographs in the house. Latasha Bryant, who was working for the Department of Children's Services ("DCS"), was also there. An investigator working for the medical examiner also came to the scene.

Officer Cooley stated that Appellant had been crying a lot and was slightly erratic. He stated Appellant was overwhelmed and sobbing. He stated that she would speak to him in a calm manner, then get a telephone call and start sobbing. When she would get off of the telephone she would speak calmly again. Appellant directed the officers to the playpen where the victim was found, to the medications that Appellant was taking at the time, and to other pertinent locations around the house.

Officer Cooley stated that Ms. Bryant was with him when Appellant brought up her prescription medications. Officer Cooley testified that Appellant told him she was taking Oxycontin, Percocet, and Oxycodone. He did not recall Appellant stating that she was taking Xanax. Ms. Bryant went through the medications and found insufficient pills in the prescription bottle for at least one medication. Appellant stated that she had been out of town and divided up her prescription because she was afraid that her family would steal pills from her prescription. However, Appellant could not tell the investigators where the missing pills were located. Officer Cooley said that he did not notice any prescription medication on furniture or table surfaces in the house.

Appellant told Officer Cooley that she and A.B., the victim's sister, were present during the day that the victim died. Appellant stated that she fed the victim some blueberry muffins around 10:00 a.m. Mr. Hannah had not spent the night at the house the previous night, but he came by in the morning. He came by a second time that day, and that is when the victim was discovered unresponsive in the playpen. Appellant told Officer Cooley that

the victim was asleep when Mr. Hannah came to visit the first time. Appellant told the officer that she had been the only one to feed the victim that day.

Officer Cooley testified that he asked Appellant and Mr. Hannah to participate in a re-enactment of how they found the victim. In addition to being included on the audio recording, the re-enactment was recorded on video. However, the video recording was lost before trial.

Officer Cooley stated that the medical examiner collected a sippy cup used by the victim immediately prior to her death. He said that the sippy cup was in the playpen where the victim had been found. Officer Cooley did not know if the medical examiner collected any other items.

Officer Cooley stated that he did not interview A.B., the victim's sister. He stated that interviews of children typically are conducted by DCS. Officer Cooley believed that DCS had conducted an interview of A.B.

The day after the victim was found and the interviews were conducted, Officer Cooley heard from the medical examiner about the autopsy on the victim. Through the course of the conversation, he was told that two types of drugs, Oxycontin and "Benzo's," were found in the victim's urine. This conversation prompted him to obtain a search warrant and return to Appellant's residence. He stated that the source of the drugs was the object of the search. During the search of Appellant's residence, the officers recovered multiple prescriptions for various medicines prescribed to both Appellant and Mr. Hannah. Among Appellant's prescriptions were Oxycontin and Alprazolam. The officers checked the contents of the bottles against the amount prescribed. Most of the bottles did not have the correct number of pills had the pills been taken as prescribed. Some bottles had more pills, and some bottles had fewer pills than there should have been. Officer Cooley stated that the officers found multiple pills and prescriptions throughout Appellant's house. For the most part, the medication was contained in pill bottles, but he also found some loose pills.

Krista Myers is an investigator with the medical examiner's office. She testified that her role is to collect as much information from the scene of a death as possible because the medical examiner cannot be there. This is especially true in the case of the death of an infant. She stated that typically when an infant death is involved, the body is taken to the hospital and police respond to the scene. She stated that it is typical for a re-enactment to be done using a doll to demonstrate the position of the infant when last seen alive and when found. The investigators are responsible for completing a Sudden Unexplained Infant Death Investigation ("SUIDI") form.

-4-

She stated that she went to Southern Hills hospital on June 27, 2008, at 6:30 p.m. She was informed that the victim was found unresponsive at 4:00 or 4:15 p.m. that same day. Ms. Myers stated that she conducted an external examination of the victim. She found vomit on the side of the victim's face and on her clothes. There were no signs of trauma. Ms. Myers took photographs of the body.

Ms. Myers also went to Appellant's house and found Officer Cooley and Ms. Bryant already interviewing Appellant. She described Appellant as "extremely distraught at times" and "mostly agitated." Ms. Myers stated that Appellant's mood shifted as she answered questions regarding the victim. When there was a break in Officer Cooley's questions, Ms. Myers introduced herself and asked additional questions. Appellant told Ms. Myers that she fed the victim blueberry muffins, cereal, and milk in a sippy cup. Appellant said that she had also given the victim Children's Tylenol before her nap. She said that the victim had been having "screaming fits" recently. Appellant told Ms. Myers she went to check on the victim around 4:00 p.m. because the victim usually did not sleep so long. She found the victim in her playpen with a comforter, toys, pacifier, and a sippy cup. Ms. Myers collected the sippy cup, some dry cereal, the Children's Tylenol, and a dirty diaper.

Appellant told Ms. Myers that she suffered from a blood-clotting disorder and chronic back pain. She said that she had been prescribed both Oxycontin and Oxycodone for these maladies. Ms. Myers testified that she did not remember Appellant's stating that she took Xanax, also known as Alprazolam.

Ms. Myers conducted a re-enactment with Mr. Hannah and Appellant. Appellant demonstrated how she had placed the victim in the playpen for her nap. Mr. Hannah demonstrated the victim's position in the playpen when she was found. He also demonstrated that he got her out of the playpen and began to perform CPR.

Dr. Amy McMasters performed an autopsy on the victim on June 28, 2008. Dr. McMasters is the Chief Medical Officer for Forensic Medical Management Services, which is a private company under contract with Davidson County. At the time of death, the victim was sixteen months old. There were no obvious signs of trauma.

She stated that she obtained fluid samples of heart blood, chest blood, bile, urine, stomach, and the vitreous fluid from the victim's eyes. She sent these samples to Aegis Laboratory for testing. She specifically requested testing for drugs. She later cancelled the request for testing of the chest blood because the heart blood is a better representation of the concentration of drugs in the system. The results of the heart blood test were that the sample was positive for Alprazolam in a concentration of 47 milligrams per milliliters. Dr. McMasters opined that the drug had been ingested within hours of her death. She testified

that this dose would not be lethal to an adult, but it was unknown if it would be lethal to a child.  The test results also showed that the victim's heart blood contained Oxycodone in a concentration of 1350 milligrams per milliliter.  Dr. McMasters stated that this dose would be lethal for an adult, as well as a child.  She stated that the concentration indicated that the victim had ingested the Oxycodone within hours of her death.

Dr. McMasters also received the results of the sample she collected of the victim's stomach contents.  The results showed that the victim's stomach contained Alprazolam, Oxycodone, and a small amount of acetominophen.  The concentration of Alprazolam was 3390 milligrams per milliliter.  The concentration of Oxycodone was 94,000 milligrams per milliliter.  Dr. McMasters testified that the level present indicated that there were many pills ingested by the victim.  She said one or two pills would not cause this concentration, but instead many pills would be needed.  Dr. McMasters could not determine if it was a case of many pills at once or over a period of time.  She stated that the level present would be considered higher than normal even for an adult.

The victim's urine was also sent for testing.  The urine sample tested positive for the presence of Alprazolam metabolite, Oxycodone, and an Oxycodone metabolite. A metabolite is present when a person's body has begun processing drugs that have been ingested.  The level of Oxycodone was higher than that of the metabolite.  This fact indicated that there had been more recent usage of Oxycodone.

Dr. McMasters testified that she sent the bile and urine samples to confirm the blood results that showed drugs in the victim's system.  She also wanted to test the stomach contents in order to determine how the drugs were given to the victim.  The fact that the victim's stomach contents tested positive for the presence of Alprazolam and Oxycodone led Dr. McMasters to conclude that the victim had ingested the drugs.  In addition, she testified that the fact that evidence of the drugs was in her blood indicated that she had ingested the drugs within hours her death.  However, the fact that evidence of the drugs was present in her urine also indicated that drugs had been in the victim's system long enough for the drugs to have been processed by the victim's body.

Dr . McMasters testified that the contents of the sippy cup which was retrieved from the victim's crib tested positive for Oxycodone.  The concentration of Oxycodone in the contents was 113 milligrams per milliliter.  According to the test results, Alprazolam was not present in the sippy cup.

Dr. McMasters opined that the cause of the victim's death was a drug overdoes of Alprazolam and Oxycodone.  She stated that the death was a homicide.  The effect upon the victim as a result of the combined drugs would have been "sedation, possibly coma, stupor,

difficulty breathing and eventually death." She said that such an overdose often affects breathing patterns and can cause snoring. Once breathing ceases, it takes only three to five minutes for irreversible brain damage to occur.

Travis Curtis was the manager for the crime submission unit at Aegis where the sippy cup and bodily fluid samples were sent for testing. He is also a forensic scientist. In his position of manager, he oversaw the testing in the laboratory and ensured that it was completed in an appropriate manner. He stated that he received a request from Dr. McMasters to test the above items. He stated that the laboratory tested the sippy cup and the victim's heart blood for opiates, benzodiazepines, and acetaminophen. The sippy cup tested positive for Oxycodone in a concentration of 113 nanograms per milliliter. The sippy cup tested negative for acetaminophen and benzodiazepines.

Mr. Curtis testified that the heart blood was negative for acetaminophen, but it tested positive for Alprazolam and Oxycodone. The concentration of Alprazolam was 50 nanograms per milliliter. According to Mr. Curtis, the toxic range for Alprazolam was 90 nanograms to about 1000 nanograms in an adult. The concentration of Oxycodone in the victim's heart blood was 1350 nanograms per milliliter. Such a concentration of Oxycodone is in the toxic range for adults. He said that in the only other infant death from an Oxycodone overdose of which he was aware, the infant's Oxycodone concentration was half that of the victim. Mr. Curtis testified that Oxycodone and Alprazolam are not combined in any pill together. Therefore, they must be taken in at least two separate pills.

Mr. Curtis testified that the laboratory also tested the victim's bile from her gallbladder to determine if benzodiazepines and opiates were present. The bile tested positive for Alprazolam as well as Alphahydroxy-alprazolam, which is a metabolite of Alprazolam. The test also showed that Oxycodone, as well as Oxymorphone, a metabolite of Oxycodone. The metabolites are a result of the body breaking down chemicals ingested. The body breaks down the original chemical into other compounds before they are eliminated by the body. Mr. Curtis testified that the half life of Oxycodone is three hours and that half of the drug would have been metabolized in this time period.

He testified that the laboratory tested the victim's urine and gastrics contents. It tested positive for Alphahydroxy-alprazolam, the metabolite. This fact indicated that some time had passed since the ingestion of the Alprazolam because the victim's body had already begun the process of breaking down the original chemical.

Although the tests showed the presence of the metabolites in the victim's bile and urine, Mr. Curtis could not state with any certainty how long the original chemicals had been

present in the victim's body. He stated that the metabolites could have been consistent with the victim's ingesting the drugs from a sippy cup during the course of the day.

The laboratory also tested the gastric contents of the victim. Mr. Curtis testified that the tests revealed the presence of Oxycodone and Acetaminophen. He stated that Acetaminophen is often prescribed with Oxycodone. However, he could not determine from the tests whether the Acetaminophen was derived from Tylenol or in conjunction with the Oxycodone.

With regard to the sippy cup, Mr. Curtis testified that the sippy cup was submitted to the laboratory for testing. He stated that the standard procedure is to keep samples for a one year period. After that time, any samples are destroyed. He stated that up until the samples are destroyed, they are available for testing. The sippy cup was kept for one year and destroyed just prior to trial.

Detective Michael Donaldson works for the Metropolitan Police Department. On June 28, 2008, he executed a search warrant of Appellant's home. The police collected 96 pill bottles. The majority of the bottles were empty. Fifteen different doctors had prescribed the medications. Based on the search, Detective Donaldson concluded that on June 28, 2008, Appellant had filled prescriptions for: (1) Alprazolam, sixty pills, two milligrams each, a thirty-day supply; (2) Oxycodone, 130 pills, 325 milligrams each, a thirty-day supply; and (3) OxyContin, thirty pills, forty milligrams each, one a day, mixed with 10 milligrams of acetaminophen. Detective Donaldson was also able to conclude that Appellant had filled two other prescriptions for Alprazolam, one for fifty pills and one for sixty pills, on June 28, 2008. He found prescriptions for Appellant's husband for both Oxycodone and OxyContin.

On September 21, 2010, a videotaped deposition was taken of the victim's sister, A.B. A.B. was ten years old at the time of the deposition. On the date in question, A.B. stated that Appellant's husband was at work and stopped by the house a few times. A.B. said that she fed the victim some cereal that morning. A.B. and the victim watched television, and the victim took a nap. A.B. stated that the victim seemed fine before she took her nap. A.B. said that she did not give the victim a sippy cup that day or prepare a sippy cup for the victim. She said that Appellant or Appellant's husband must have prepared the sippy cup.

In the afternoon, A.B. heard Appellant's husband scream that the victim was dead. Appellant told A.B. to call 911. She did so and handed the telephone to Appellant. According to A.B., Appellant told her to hide anything that looked like it could kill the victim. A.B. stated that Appellant kept her medicine in a closet upstairs and usually kept pill bottles on the table. However, she did not remember seeing pill bottles on the table on the day of the victim's death.

Dr. Leeanne O'Brien is a pediatrician. She saw the victim on June 25, 2008. Appellant brought the victim to see her because Appellant reported that she was concerned about the victim because she had been screaming, wheezing, and coughing for the two weeks leading up to the visit. Appellant also reported asthma and vomiting. Dr. O'Brien found that the victim had a wet or productive cough. She thought that the victim might have bronchitis or a sinus-related issue. Dr. O'Brien prescribed an antibiotic. However, she did not know if Appellant had the prescription filled. She stated that she had never prescribed Xanax for a child the victim's age and would never prescribe Oxycodone for a child the victim's age.

Because this was the first time Dr. O'Brien had examined the victim, she told Appellant that the victim needed a full physical examination. Dr. O'Brien did not find any developmental abnormalities or any indication of narcotic usage. She ordered a urinalysis because of a family history of kidney disease. However, the urinalysis did not include a drug screen.

Dr. O'Brien received an extensive social history from Appellant. She learned that Appellant was in the process of separating from her husband and was depressed. Appellant stated that she was raising two children, she had recently lost her grandparents, and her former husband recently moved to California. Dr. O'Brien recommended social workers with experience in drug and alcohol rehabilitation. She recommended rehabilitation for Appellant and her husband.

On August 11, 2008, Detective Tom Rollins with the Metropolitan Police Department was assigned to the case at hand. He attended a custody hearing regarding A.B. in December 2008. Detective Rollins heard the testimony of Appellant regarding the victim's death. At the custody hearing, she testified that she had prepared the sippy cup of milk for the victim. She categorically denied that her husband had prepared the cup. She wondered if the victim could have put a pill in her mouth and that the pill had gone into the sippy cup. Later in her testimony she admitted that this scenario was not possible because liquid could not flow back into the sippy cup. Appellant also testified at the custody hearing that her husband was not living in the home at the time of the victim's death. She stated that she kept her medicine in her purse, a closet in the bonus room, and on top of a mantel. She agreed that her husband had asked her on previous occasions to keep medicine away from the victim.

Michael Orman also testified at the trial. He stated that he worked with Appellant's husband. In the spring of 2007, he and his girlfriend, Carissa Desorbo, visited Appellant and her husband to see their new baby, the victim. They all went upstairs in the house. Mr. Orman overheard Appellant tell Ms. Desorbo that "they" were in her purse. Mr. Orman saw Ms. Desorbo pull pill bottles out of Appellant's purse and put the bottles on the counter along with her own pill bottles. Mr. Orman said that it appeared that Appellant and Ms. Desorbo

were trading pills. Later in the day, he saw Ms. Desorbo crushing pills on the counter while Appellant stood next to her. Ms. Desorbo got another pill out of one of the bottles and held it up next to a baby bottle. Mr. Orman said it appeared that Ms. Desorbo was measuring the pill against the numbers on the baby bottle. Mr. Orman asked Ms. Desorbo what she was doing. Ms. Desorbo put the baby bottle down and said she was getting ready to take a Xanax. Mr. Orman said that the encounter led him to conclude that Appellant and Ms. Desorbo were getting ready to put drugs in the baby's bottle. Mr. Orman left shortly thereafter.

Mr. Orman testified that before he left he heard a fight between Appellant and her husband. He stated that the argument was about which one of them was going to change the baby's diaper. Appellant told her husband, "[T]his f***ing baby has been keeping me up every night."

Melissa Kibler-Sircy stated that she had been a friend of the Appellant since 1999. She stated at one time she and Appellant were very close. Ms. Kibler-Sircy stated that after the victim was born, she often visited Appellant to help care for the victim and do chores such as laundry and house cleaning. When Ms. Kibler-Sircy was at the house, Appellant watched television or slept. Ms. Kibler-Sircy stated that Appellant was very depressed at that time. Appellant would often stay up drinking all night long. The victim usually stayed in the playpen in the bonus room.

Ms. Kibler-Sircy stated that she knew that Appellant took various medications. She admitted that she had seen medication on the end table in the bonus room, however, she did not see any medication lying out in the weeks prior to the victim's death. She said that at the time of her death, the victim would not have been able to remove childproof lids from pill bottles.

Ms. Kibler-Sircy testified that she did not know Ms. Desorbo. She said that she had heard Appellant talk about Desorbo. Appellant told Ms. Kibler-Sircy that Ms. Desorbo gave her baby Xanax so that the baby would go to sleep. Ms. Kibler-Sircy suggested that Appellant call the authorities, but Appellant did not respond to her suggestion. Ms. Kibler-Sircy recalled that in the weeks before the victim's death, Appellant said that the victim was throwing tantrums and acting like a brat.

On the day in question, Ms. Kibler-Sircy was traveling to Gatlinburg with her friend Tracy Masterson. Ms. Kibler-Sircy called Appellant on the way to Gatlinburg and heard the victim babbling in the background. Ms. Kibler-Sircy arrived in Gatlinburg around 3:30 or 4:00 p.m. Shortly after arriving, Appellant's husband called her screaming that the victim was dead. Appellant called immediately after her husband. Ms. Kibler-Sircy said that based

-10-

on the telephone calls she thought Appellant and her husband were panicking. Ms. Kibler-Sircy returned to Nashville.

Sometime after the victim's death, Appellant told Ms. Kibler-Sircy that she had prepared the sippy cup for the victim the day that she died. Appellant told Ms. Kibler-Sircy that she poured the milk directly into the sippy cup.

Ms. Kibler-Sircy stated that Appellant's relationship with her husband began to deteriorate after the victim was born. Ms. Kibler-Sircy admitted that she had engaged in a sexual relationship with Appellant's husband.

Tracy Masterson also testified at trial. She stated that she met Appellant through Ms. Kibler-Sircy and that she and Appellant were very close. Ms. Masterson said that Appellant and her husband accused each other of infidelity. Ms. Masterson said in June 2008 she saw Appellant's husband use steroids and other drugs.

Ms. Masterson said that she went to Gatlinburg with Ms. Kibler-Sircy. She said that Ms. Kibler-Sircy called Appellant and that Ms. Masterson and Ms. Kibler-Sircy considered stopping by Appellant's house because they were concerned about her physical condition and whether she could care for the victim. She said that when she visited Appellant's home Appellant was on the couch, and the victim was in the playpen.

Ms. Masterson said she was with Ms. Kibler-Sircy when she received the telephone call informing her that the victim was dead. They headed back to Nashville and arrived at Appellant's house around 8:00 or 9:00 p.m. She stated that the police would not let them into the house.

Tommy Hannah is the father of Appellant's husband, Michael Hannah. Mr. Hannah testified that he told Michael prior to the victim's death that he was worried that the victim could get to various medications because they were left on the end table in the bonus room. He told Michael that he needed to fix the issue, and that if he did not, Mr. Hannah threatened to take action. After he spoke with Michael, Mr. Hannah stated that he did not see anymore pills. Mr. Hannah stated that Michael committed suicide in September 2010. After Michael's death, Mr. Hannah acquired a digital recorder that belonged to Michael. Mr. Hannah stated that the recorder included several conversations between Appellant and her husband. The recordings were played for the jury.

Jeremiah Luke Bryant, Appellant's brother, testified on behalf of Appellant. He stated that on the date in question, his father called him at work to tell him that the victim had died. He said that he and his father arrived at Appellant's house around 6:00 p.m. He said that an

officer at the door of the house would not let them enter the house. Mr. Bryant recalled that the officer said they were interviewing Appellant. Mr. Bryant testified that they waited thirty minutes to an hour before they were allowed to go inside. They went upstairs and sat with Appellant. Ms. Kibler-Sircy, Ms. Masterson, Mr. Bryant, and his father remained with Appellant after the investigators left.

Michael arrived and began grabbing things from the house. Mr. Bryant testified that he had not seen Michael earlier. Mr. Bryant said that at the time of the victim's death, Michael was using steroids and other drugs. He said that Michael was paranoid and accused Mr. Bryant of having an affair with his sister, Appellant.

Appellant testified on her own behalf. She denied that she put Oxycodone or Alprazolam in the victim's milk. Appellant denied that she killed the victim. She said that she had previously been married to the father of A.B. Appellant stated that she married Michael Hannah on May 5, 2006, and became pregnant almost immediately. She said that around June 2008, her relationship with Michael was not good.

She stated that she took the victim to the pediatrician because the victim was having screaming fits, breathing issues, and was snoring.

On June 27, 2008, Appellant stated that she woke up and fed the victim blueberry muffins and cereal. She poured milk into the victim's sippy cup from a milk container kept in a refrigerator upstairs in the bonus room. Appellant said that the sippy cup was in a bathroom upstairs. Appellant rinsed out the cup and filled it with milk. She said that she filled it twice that day. She said that she was the victim's primary caretaker the day of her death. Michael stopped by the house at 1:00 p.m., but he did not feed her or pick her up. She stated that A.B. did not give the victim a bottle or sippy cup that day.

Appellant said that the victim was in her presence the entire day except when Appellant took a nap around 3:00 p.m. while the victim was asleep. Appellant believed that Michael arrived around 4:15 p.m. or 4:20 p.m. He found the victim unresponsive shortly after he arrived.

She admitted that she had suggested various ways that the victim could have ingested the drugs. She said that she told the police that the victim could have gotten into some medication. She said that A.B. might have given the victim drugs. She also said that drugs must have been in the milk that was in the upstairs refrigerator. However, she did not share this idea with the police.

Appellant admitted that she had taken Hydrocodone from 2005 to 2008. She also admitted that she obtained various prescriptions under three different names: her maiden name, Bryant; her first married name, Buchanan; and her second married name, Hannah.

At the conclusion of the trial, the jury found Appellant guilty as charged. The trial court imposed a life sentence for the first degree murder conviction and scheduled a separate sentencing hearing for the remaining convictions. The trial court ordered the remaining sentences to run concurrently to the life sentence.

## ANALYSIS

## Rule 404(b)

Appellant specifically complains about the State's motion to introduce the testimony of Michael Orman as evidence of prior bad acts under Rule 404(b) of the Tennessee Rules of Evidence. Appellant is referring to Mr. Orman's testimony regarding witnessing his girlfriend hold up a Xanax pill to the victim's baby bottle while Appellant watched her do so.

The Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases . . . ." *State v. Banks*, 564 S .W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S .W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of

-13-

other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

Prior to trial, the State filed a notice to use evidence of Appellant's prior conduct of bad acts under Rule 404(b). Appellant filed a response calling for the denial of the State's request. The trial court held a hearing on June 27, 2011. Mr. Orman testified at the hearing. He stated that he and his girlfriend, Ms. Desorbo, went to see the victim at Appellant's house when the victim was three or four months old. As soon as they got there, Ms. Desorbo asked Appellant where the pills were. Mr. Orman witnessed Appellant and Ms. Desorbo crushing some type of pill. He also witnessed an argument between Appellant and her husband about the victim crying and keeping her awake at night. Shortly thereafter, Mr. Orman witnessed his girlfriend hold a baby bottle up and hold a pill next to the bottle. He stated that Appellant was standing next to Ms. Desorbo watching her as she held the pill up to the baby bottle.

The trial court made the following findings:

> In terms of the 404(b) issues we had last week. We went through a number of those and ended up with issues about the April, May '07 information provided by Mr. Orman and involving this Carissa Desorbo . . . .
>
> In terms of the proffer dealing with the April or May '07 information from Mr. Orman; as I said the other day, there's not been any information evidence-wise, testimony-wise to the contrary. I mean, Mr. Orman answered every question he was asked, appeared to be forthright with his answers. So the State has shown, based – for this particular purpose – that this incident occurred, those discussions and activities occurred, by clear and convincing proof. The issue is: Is it probative of anything and if so, does it meet the balancing test under 404(b) if one finds that [Appellant] being present watching this Ms. DeSorbo do these things – I mean, there was no specific information provided by Mr. Orman that [Appellant] was talking or saying anything about okay, this is how you do it, or how much this, how much that. I mean, there are – I understand there are circumstances that one could argue. But if that is a bad act, being present when someone's discussing with a baby

bottle or a cup in one hand and a Xanax in the other that something diabolical is occurring, it is – can be, if believed, probative in terms of her, [Appellant], having information that then becomes relevant when this situation happens in June of '08. That is: Who in the world would ever put Xanax in a baby's sippy cup? Oh, well remember about a year ago when Ms. DeSorbo was showing [Appellant] how to do it. That obviously is relevant and probative in terms of identity, that is – I mean, there may be other proof that someone else has investigated Xanax and a baby, I don't know. But in terms of the proof on this issue, there has been proof in terms of how that's relevant to identity, lack of mistake, intent, motive, purpose for doing it identity, and I don't find that that's unfair prejudice. Is it prejudicial, or prove something, prove some issue in a criminal case, some element, or disprove some element, but it's not, in the Court's opinion, the fact that there is high probative value, is not outweighed by the unfair prejudice.

Appellant bases his argument on two theories: (1) the trial court failed to follow the proper procedure for a 404(b) question and (2) there was no bad act committed by Appellant, and, therefore, no 404(b) issue. We agree with Appellant that Mr. Orman's testimony did not show a prior bad act by Appellant. For Rule 404(b) of the Tennessee Rules of Evidence to come into play, the prior bad act in question must have been committed by the defendant. *Parton*, 694 S.W.2d at 303. In this case, Mr. Orman testified that Appellant was standing with Ms. Desorbo while she held up the baby bottle and held a pill next to it. Therefore, we conclude that this evidence does not demonstrate a prior bad act by Appellant and that Rule 404(b) does not apply.

If there is no Rule 404(b) issue, the question becomes whether the evidence should have been admitted under Rules 401 and 402. *State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997). As stated above, to be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951. In order to be admissible, evidence must be relevant and probative to an issue at trial. *State v. McCary*, 922 S.W.2d 511, 515 (Tenn. 1996); *see also* Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded

at trial if the probative value of that evidence "is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The determination of relevancy is left to the discretion of the trial court, and this Court will not overturn a trial court's determination in this regard in the absence of an abuse of discretion. *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

We conclude that Mr. Orman's testimony is relevant and that its probative value outweighs any unfair prejudice. Initially, we point out that Mr. Orman did not testify at the hearing or at trial that he saw Appellant or Ms. Desorbo put any mediation into the baby bottle. His testimony was that he saw the women exchange pills and crush the pills into powder. He next saw Ms. Desorbo hold up a baby bottle and a pill next to each other as Appellant watched. These are facts that are relevant to the question as to whether someone put drugs into the victim's bottle and how it could have been done. Therefore, we conclude the trial court did not abuse its discretion in admitting this evidence.

### Material Witness

Appellant argues that she was denied her "constitutional right of compulsory process for obtaining a material witness." At the hearing on the 404(b) question, the State presented Mr. Orman as a witness. As stated above, Mr. Orman testified about Ms. Desorbo's activities at Appellant's home. The assistant district attorney stated at the hearing that the district attorney's office could not locate Ms. Desorbo. The State offered to put on Investigator Hugh Coleman who had interviewed Ms. Desorbo. The assistant district attorney stated that in her interview with Investigator Coleman, Ms. Desorbo denied the substance of Mr. Orman's version of events. The assistant district attorney stated that they would make Investigator Coleman available for the defense. The assistant district attorney also stated that it would stipulate to Ms. Desorbo's denial of the facts testified to by Mr. Orman.

Later in the hearing, Appellant's counsel stated that they were trying to locate Ms. Desorbo. Trial counsel stated that they had contacted Ms. Desorbo's sister and brother-in-law and had hired a private investigator. However, they had not located her by the time of hearing. The trial court pointed out to Appellant that the defense had had nine months prior to the hearing to locate Ms. Desorbo. Appellant asked for a continuance, and the trial court denied it. However, at the conclusion of the hearing, the trial court stated that it would address the 404(b) issue in a few days, on Monday.

When the trial court revisited the issue the next Monday, Appellant still had not located Ms. Desorbo. Appellant asked for a four week continuance but admitted that there

were no leads as to her whereabouts and had no idea when or if she could be located. The trial court denied the continuance and stated that the trial could be continued until Christmas, but Appellant still would not know if Ms. Desorbo could be located. Therefore, the request was denied.

On appeal, Appellant argues that the trial court's denial of her motion for a continuance was a violation of her constitutional right to compulsory process for obtaining a material witness. The granting of a continuance rests within the sound discretion of the trial court. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995). In order to show prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance or that the denial of the continuance denied the defendant a fair trial. *Id.* Moreover, a defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice. *Odom*, 137 S.W.3d at 589. This Court has recognized that a continuance might be appropriate in order to afford a defendant a "reasonable opportunity" to locate a witness. *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). However, the burden rests with the defendant to show that a continuance might have reasonably resulted in locating the witness. *Id.*; *see also Brown v. State*, 489 S.W.2d 855, 857 (Tenn. Crim. App. 1972).

Criminal defendants are afforded the "right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI; Tenn. Const. art. I, § 9; T.C.A. § 40-17-105; *see State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). With regard to compulsory attendance of witnesses, the Supreme Court has stated the following:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967).

-17-

The foundation of a claim of denial of compulsory process is that the witness or the evidence the Defendant seeks to offer is material to the defense. *See, e.g., United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Furthermore, if a defendant attempts to establish a violation of his right to compulsory process, he "must at least make a plausible showing of how [the witness's] testimony would have been both material and favorable to his defense . . . ." *Id.* at 867.

In the case at hand, the State filed a notice on September 13, 2010, that it intended to present the testimony of Mr. Orman. The 404(b) hearing in question was held on June 23 and 27, 2011. Therefore, the hearing was a full nine months after Appellant had notice of the intention to present Mr. Orman as a witness. Appellant's counsel stated that he had spoken to Ms. Desorbo's family, conducted a records check, and hired a private investigator. However, trial counsel did not state that there had been any progress in locating Ms. Desorbo. In addition, on the first day of the hearing, the assistant district attorney also stated that the State had searched for Ms. Desorbo to no avail.

As stated above, to prevail on a claim Appellant must prove that her rights were violated. However, based upon our review of the record, we can find no presentation of evidence by Appellant demonstrating what Ms. Desorbo would have testified if presented as a witness. The State offered to bring in the investigator to testify regarding his previous interview of Ms. Desorbo and her denial of Mr. Orman's claims. However, Appellant did not present the investigator at the subsequent hearing on June 27, 2011. Furthermore, we cannot tell whether Appellant presented any evidence regarding Ms. Desorbo's expected testimony at the motion for new trial because no transcript of the motion for new trial was included in the record. Therefore, Appellant has not proven that Ms. Desorbo was a material witness. For this reason, she has also failed to prove that the trial court denied its discretion in denying her motion for continuance. Appellant is not entitled to relief on this issue.

**Denial of Motion to Suppress Statement**

Appellant argues on appeal that the trial court erred when it denied her motion to suppress her statements made to officers the evening that the victim was found. The State disagrees.

Prior to trial, Appellant filed a motion to suppress her statements made to law enforcement personnel the evening that the victim was found dead. As set out above, after 911 was called, various members of law enforcement arrived and began asking Appellant and her husband questions regarding the circumstances of the victim's death. They were asked to participate in a re-enactment of how they found the victim. In addition, an interview was conducted of Appellant and her husband that occurred in the bonus room of the house. The

interview was surreptitiously recorded. Appellant was allowed to receive telephone calls during the interview and move around. The trial court held an evidentiary hearing on the motion. The trial court denied the motion to suppress by written order.

"This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise." *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S .W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). When the trial court's findings of fact are based entirely on evidence that does not involve issues of witness credibility, however, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions, and the trial court's findings of fact are subject to de novo review. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). Further, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

### A. Miranda Warnings

Appellant's initial argument regarding the denial of her motion to suppress is that her statements were obtained in violation of her right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, § 9 of the Tennessee Constitution because they were the product of custodial interrogation without the benefit of the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966).

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive this right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the United States Supreme Court held that a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will

be appointed for him prior to any questioning if he so desires." *Id.* at 479. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. *Id.* Accordingly, for a waiver of the right against self-incrimination to be constitutionally valid, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by *Miranda*. *Id.* at 444. In considering the totality of the circumstances a court should consider:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (citing *State v. Readus*, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988)). However, no single factor is necessarily determinative. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (citing *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)). Further, "[a] trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's ruling." *State v. Keen*, 926 S.W.2d 727, 741 (Tenn. 1994).

In the case at hand, Appellant argues that she was in custody during the interview and, for that reason, *Miranda* warnings are required in order for her statements to be introduced at trial.

As this Court stated in *State v. Cooper*, 912 S.W.2d 756 (Tenn. Crim. App. 1995):

> Whether one is in custody turns not on whether the interrogation occurred in a "coercive environment" but on whether the accused was "deprived of his freedom of action in any significant way." *Oregon v. Mathiason*, 429 U.S. 492 (1977). Under *California v. Beheler*, 463 U.S. 1121, 1125 (1983), the ultimate inquiry to determine whether a person is "in custody" for purposes of receiving

*Miranda* protection is "simply whether there is a 'formal arrest or restraint of freedom of movement' of the degree associated with a formal arrest."

912 S.W.2d at 762. "[T]he test is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996).

The trial court's findings of fact with regard to the suppression of Appellant's statement to the officers are as follows:

> The Court finds that under the totality of the circumstances the defendant was not in custody when she made her statements. The Court has reviewed the audio recording of the defendant's statements, which corroborate Detective Cooley's testimony that he interviewed the defendant in a casual, conversational tone. The Court accredits the officers' testimony that they did not know if a crime had occurred, much less if the defendant was a suspect. At no point did the officers ever confront the defendant with suspicion of her guilt in a criminal act. The defendant was not transported to another location, but was interviewed in the comfort of her own home. She moved freely to various parts of her residence, both inside and out front. The Court accredits the testimony of the officers that the defendant was never restrained in any way. The defendant interrupted the interview several times to answer incoming phone calls. The overall character of the interview was that of an attempt to discover details that might explain how the victim died, and not focused on whether the defendant was culpable in or perpetrated a crime. Based on the foregoing analysis, under the totality of the circumstances, a reasonable person in the defendant's position would not consider herself deprived of freedom of movement to a degree associated with a formal arrest. Therefore, this was not a custodial interrogation as contemplated by *Miranda*, and the officers were not required to read the defendant her constitutional rights. Therefore, this issue is without merit.

### 1. At Beginning of Interview

Upon our review of the record at hand, we conclude that the evidence does not preponderate against the trial court's denial of the motion to suppress. The testimony at both the hearing and the trial show that Appellant was not in custody and, therefore, there was no

requirement that she be advised of her *Miranda* rights. Witnesses for the State testified that Appellant was interviewed in her home in her bonus room. She was allowed to freely roam the house and allowed to receive telephone calls from relatives. She was not isolated. Her husband and other family members and friends were present during parts of the interview. The tone was conversational and not antagonistic. The facts surrounding the interview do not lead to the conclusion by a reasonable person that she would have been "deprived of freedom of movement to a degree associated with formal arrest." *See Anderson*, 937 S.W.2d at 855. Therefore, it was not a situation in which *Miranda* warnings were necessary.

## 2. In Middle of Interview

Appellant also argues that the trial court erred in denying her motion to suppress with regard to the moment of the interview where Appellant asked whether the victim could have accidentally ingested Appellant's medication. Appellant argues that at this point in the interview, it became more of an interrogation. However, we conclude, once again, that there is no evidence to support this conclusion. There is still no evidence that a reasonable person would have felt that she was deprived of her freedom. She was still allowed to move about the house and take telephone calls. Therefore, we find no support for the requirement of *Miranda* warnings for the introduction of the statements into evidence.

## B. Voluntariness of Statement

Appellant also argues that her statement was not voluntary because she was under extreme emotional distress and intoxicated.

Even though a statement was not given as a result of custodial interrogation, the statement must still be voluntary in order to be admissible. *See Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). In order to be considered voluntary, the statement must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1897); *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). Instead, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id.*

Whether a statement was voluntarily given is determined by examining the totality of the circumstances. *Kelly*, 603 S.W.2d at 728-29 (Tenn. 1980). "A trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's

ruling." *State v. Keen*, 926 S.W.2d 727, 741 (Tenn. 1994). In addition, the findings of fact made by the trial court at a hearing on a motion to suppress will also be upheld unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge." *Id.*

The trial court made the following findings:

> After reviewing the testimony of the witnesses, the audio recording of the June 17, 2008 interview, and the audio recording of the juvenile hearing held December 8, 2010, the Court finds that the defendant gave a knowing and voluntary statement. Throughout the interview, the defendant answered Detective Cooley's questions in an appropriate manner that indicated a rational intellect. The defendant displayed a full memory and gave a detailed narrative of past events that stayed consistent throughout the questioning. The defendant was emotional and upset at various times during the interview, but never for an extensive period of time. The Court notes that her overall demeanor of the June 27, 2008 interview is very similar to that she displayed at the juvenile hearing held December 8, 2010. The Court accredits the testimony of Latasha Bryant and Detective Cooley that the defendant was coherent and displayed behavior that was not indicative of being under the influence. The Court is not convinced that the defendant's brother and father were even present during the relevant portions of any interview of the defendant[ ]. After examining all the proof, the Court finds that the defendant gave a knowing, voluntary statement that was the product of a free mind and rational intellect.

(footnote omitted).

In *State v. Morris*, 24 S.W.3d 788 (Tenn. 2000); our supreme court attached this Court's opinion as an appendix to its own opinion. The following is stated in the appendix:

> The law in this state is well-established that "[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary." *See State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980), *cert. denied*, 454 U.S. 1096, 102 S. Ct. 667, 70 L. Ed.2d 636 (1981); *see also State v.* [*Stephen Lajuan*] *Beasley*, No. 03C01-9509-CR-00268, 1996

-23-

WL 591203 (Tenn. Crim. App. at Knoxville, Oct. 10, 1996), *reh'g denied*, (Sept. 15, 1997), *perm. to appeal denied*, (Tenn. Apr. 27, 1998); *State v. [Larry Thomas] Teeters*, No. 0201-9304-CC-0051, 1994 WL 29855 (Tenn. Crim. App. at Jackson, Feb. 2, 1994). "It is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." *Robinson*, 622 S.W.2d at 67 (citing *Lowe v. State*, 584 S.W.2d 239 (Tenn. Crim. App. 1979)). The test to be applied in these cases is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime. [*Stephen Lajuan*] *Beasley*, No. 03C01-9509-CR-00268 (citations omitted).

*Morris*, 24 S.W.3d at 805.

In the case at hand, Appellant has not proven that the evidence preponderates against the findings of the trial court. The officers arrived at Appellant's house and proceeded to ask her questions in order to determine why the victim had died. There were no coercive tactics, threats, or promises made to extract Appellant's statements. The officers testified that at the time they were at Appellant's home, they did not even know that the victim's death was a homicide. The officers stated that it was not readily apparent to them that Appellant was intoxicated and that she responded appropriately to their questions. They did acknowledge that she was very distraught, but they stated that she would calmly answer their questions and subsequently break down when speaking on the telephone with relatives.

We conclude that Appellant's statements were voluntary and not affected by her alleged intoxication or distress. Therefore, *Miranda* warnings were not necessary and Appellant is not entitled to relief.

## Loss or Destruction of Evidence

Appellant argues that the trial court erred in denying her request to instruct the jury on the State's responsibility to gather, preserve, and produce evidence. Appellant bases this argument on the fact that the State lost the videotape of the re-enactment performed by Appellant and her husband of how they found the victim and the destruction of the sippy cup and its contents.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial.[2] To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 110-11 (1976).

The State has a general duty to preserve all evidence subject to discovery and inspection as part of Tennessee Rule of Criminal Procedure 16. The case of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), illustrates the procedure to examine situations in which the State fails to preserve evidence. In *Ferguson*, the defendant was arrested for driving under the influence ("DUI"). The videotape of various sobriety tests performed by the defendant was inadvertently taped over before his trial. *Ferguson*, 2 S.W.3d at 914. The defendant appealed, arguing that the State violated his Due Process rights by failing to preserve the videotape. In its review of defendant's issue, our state supreme court adopted a test for courts to use in determining whether the loss or destruction of evidence has deprived a defendant of a fair trial. *Id.* at 917. The initial analytical step in this test for determining whether there was any duty to preserve evidence was described as follows:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). The Court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." *Id.* Accordingly, those factors include: "(1) The degree of negligence involved; (2) The

---

[2] "As a general rule, . . . a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." *State v. Ferguson*, 2 S.W.3d 912, 914 n.3 (Tenn. 1999) (citing *Betts v. Brady*, 316 U.S. 455 (1942); *Watkins v. State*, 393 S.W.2d 141, 144 (Tenn. 1965); *Lofton v. State*, 898 S.W.2d 246, 248 (Tenn. Crim. App. 1994)).

significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) The sufficiency of the other evidence used at trial to support the conviction." *Id.* at 917. "If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges." *Id.* However, dismissal is but one of the trial judge's options. *Id.*

In the order denying the motion for new trial, the trial court made the following findings with regard to this issue:

> The defendant asserts a new trial is required because the State destroyed and/or lost evidence in this case because the sippy cup from the defendant's residence alleged to contain milk with Oxycodone was destroyed. Also the video tape of the reenactment at the scene of the Defendant's home was lost. The Court finds the defendant has not shown pursuant to *State v. Ferguson*, 2 S.W.3d 912, 914 (Tenn. 1999), of a duty of the State to preserve the evidence. Even if the State should have preserved the evidence, the Court finds there has not been proof of the requisite degree of negligence. The evidence at trial showed that the evidence was destroyed as part of a routine procedure of the lab. Also, the child's cup was not significant in light of the secondary evidence available and the fact that the drugs were found in the victim's system. There was no dispute as to the cause of death.

### Sippy Cup

Appellant argues that her due process rights were violated when the State destroyed the sippy cup recovered at her house which contained milk that later tested positive for oxycodone. At trial, Appellant raised the issue of a need for a preservation of evidence instruction at the conclusion of Appellant's case. The trial court stated that there had been no *Ferguson* motion, which usually precedes such an instruction request. Likewise, we have found no such motion or objection prior to Appellant's request for the jury instruction. Appellant did raise the issue in her motion for new trial.

The State argues that the sippy cup did not possess exculpatory value. We agree. The contents of the sippy cup were tested and the results were that the milk contained therein was mixed with Oxycodone. Appellant told the officers and testified at trial that she alone fed the victim the day of her death. We conclude that the cup of milk laced with Oxycodone that was given to the victim whose urine, heart blood, and bile all showed the ingestion of

Oxycodone is not exculpatory. Therefore, Appellant has failed to demonstrate that the State had a duty to preserve the evidence.

Re-enactment Videotape

Appellant also argues that she was denied a fair trial because the State lost the videotape of the re-enactment of how Appellant and her husband found the victim. Appellant argues that this videotape was the "best evidence of [Appellant's] level of impairment during the police questioning." The State argues that this issue is waived because Appellant failed to raise this issue in the trial court.

When Appellant requested the instruction of the trial court, trial counsel did not raise the issue of the re-enactment videotape. The only evidence raised as a subject of the instruction was the sippy cup. Appellant did specifically raise the issue of the re-enactment in her amended motion for new trial.

Upon a review of the record on appeal, we conclude that Appellant has not proven that the loss of the re-enactment videotape deprived her of a fair trial. She has not shown that the videotape had exculpatory value that was apparent before the videotape was lost. She contends that the videotape would demonstrate the level of her intoxication during the demonstration. However, even if she had been intoxicated during the re-enactment, this fact is not relevant as to question whether she fed oxycodone and Alprazolam to the victim prior to her death. In addition, the State's witnesses testified that she did not appear intoxicated, and Appellant presented her father and brother who testified that she was intoxicated. Also, there was an audio recording of the re-enactment which could equally demonstrate if Appellant was intoxicated by showing whether she was slurring her words or incoherent.

Furthermore, even if we assume that she meets the initial analytical step and there was a duty to preserve the videotape, Appellant has not proven that the missing evidence affected the fundamental fairness of the trial. As stated above, Appellant must show the degree of negligence involved; the significance of the destroyed evidence, considering any secondary evidence; and the sufficiency of the other evidence presented at trial. *See Ferguson*, 2 S.W.3d at 917.

In the record provided on appeal, Appellant has not cited to the record of the motion for new trial. In fact, we cannot locate the transcript of the motion for new trial in the record on appeal. Therefore, we have no evidence as to the level of negligence involved in the loss of the videotape.

We have already stated that there was an audio recording of the re-enactment as well as witnesses for both the State and Appellant who testified as to whether Appellant was intoxicated. The other evidence presented at trial was that Appellant was the only person, according to her own statement, who fed the victim. Appellant stated that she prepared her milk and gave it to her. At the autopsy, it was discovered that the victim had been ingesting oxycodone for some time and had most likely ingested some within a short time period before her death. We conclude from the record on appeal, that the loss of the re-enactment videotape did not affect the fundamental fairness of Appellant's trial.

### Loss or Destruction of Evidence Jury Instruction

Appellant also argues that the trial court had a duty to instruct the jury on the preservation of evidence. A trial court has a "duty to give a complete charge of the law applicable to the facts of the case." *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). However, Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this Court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

We have previously determined that there was no violation under *Ferguson*. Therefore, there was no basis to give an instruction on the preservation of evidence.

### Negligence Jury Instructions

Appellant argues that the trial court erred in instructing the jury on the State's requested instruction for negligence. The following is Appellant's argument in its entirety regarding her allegation that the trial court erred in instructing the jury on negligence:

> The State requested a special jury instruction on aggravated child neglect. (Vol. XI, p. 176-7). The Appellant objected stating the pattern jury instruction on aggravated child neglect should be read to the jury without the additional language requested by the State defining neglect. (Vol. XI, p. 177).

The trial court overruled the objection and included the superfluous negligence definition. (Vol. XI, p. 194; Vol. XII, p. 272). The trial court instructed the jury that

> Neglect is continuing a course of knowing conduct beginning with the first act or omission that causes adverse effects to a child's health or welfare. Neglect can be an act of omission or omission. Neglect can occur when a parent or guardian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for a child.

(Vol. XII, p. 272). The additional language unduly prejudiced the Appellant and denied her a fair trial by improperly instructing the jury on the law of negligence.

There is no discussion as to why the instruction was prejudicial or any citation to authorities to demonstrate how the instruction was prejudicial. Tennessee Rule of Appellate Procedure 27(a)(7) provides that a brief shall contain, "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." *See also State v. Sanders*, 842 S.W.2d 257, 260-61 (Tenn. Crim. App. 1992). Appellant does not accompany her recitation of the events surrounding the giving of the instruction and her assertion of prejudice with any argument or citation to authorities. This issue is waived.

## Right of Confrontation

Appellant's final argument is that her constitutional right to confrontation was violated when the trial court allowed the playing of a tape recording in which her deceased husband's voice could be heard. In her brief, the heading of the argument states that the right of confrontation is found in the Tennessee and United States Constitutions. However, these are the only citations to any authority in this entire section of the brief. Appellant goes on to set out the facts leading up to the denial of her motion in limine and her objection at trial prior to the playing of the tape recording. There is no argument as to how the tape violated her right to confrontation and there is no citation to any authority to support such an argument.

As stated above, an issue in a brief that fails to include an argument and cite to applicable authority is waived.  *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); *see also Sanders*, 842 S.W.2d at 260-61.  Therefore, this issue is waived.

## CONCLUSION

For the forgoing reasons, we affirm the judgments of the trial court.


_____
JERRY L. SMITH, JUDGE